IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Benjamin Robinson, Jr., <br> Plaintiff, <br> vs. <br> Michael J. Astrue, <br> Commissioner of Social Security, <br> Defendant. | Civil Action No. 6:08-3551-MBS-WMC <br><br> **REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a), D.S.C., concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed applications for disability insurance benefits (DIB) and supplemental security income (SSI) benefits on January 7, 2004, and November 7, 2003, respectively, alleging that he became unable to work on July 3, 2002. The applications were denied initially and on reconsideration by the Social Security Administration. On

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

October 21, 2004, the plaintiff requested a hearing. The administrative law judge, before whom the plaintiff, his attorney, and a vocational expert appeared on May 18, 2005, considered the case *de novo*, and on September 28, 2006, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on August 22, 2008. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

> (1) The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.
>
> (2) The claimant has not engaged in substantial gainful activity since July 3, 2002, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).
>
> (3) The claimant has the following severe impairments: chronic obstructive pulmonary disease; a right shoulder injury with a history of rotator cuff repair; cervical degenerative disc disease; diabetes; and sleep apnea (20 CFR 404.1520(c) and 416.920(c)).
>
> (4) The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> (5) After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity for work at the light (as described by the Commissioner of the Social Security Administration as involving lifting and carrying 20 pounds occasionally and 10 pounds frequently as well as an ability to stand for 6 hours in an 8-hour workday, walk for 6 hours in an 8-hour workday, and sit for the remaining 2 hours in an 8-hour workday) not involving concentrated exposure to extreme heat/cold; not involving concentrated exposure to environmental respiratory irritants including dusts, gases, strong odors, and fumes as well as poor

ventilation; not requiring more than occasional bending, squatting, stair climbing, kneeling, and twisting; not requiring climbing ropes/ladders/scaffolding; not requiring driving; and not requiring work around dangerous moving machinery or at unprotected heights.

(5) The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

(6) The claimant was born on August 8, 1959 and was 42 years old on the alleged disability onset date, which is defined as a younger individual age 18-44 and is currently 46 years old, which is defined as a younger individual age 45-49 (20 CFR 404.1563 and 416.963).

(7) The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

(8) Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled", whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

(9) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

(10) The claimant has not been under a "disability," as defined in the Social Security Act, from July 3, 2002 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## **APPLICABLE LAW**

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and

who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the

4

national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

**EVIDENCE PRESENTED**

The plaintiff was 42 years old at the time of the alleged onset of his disability in 2002, and 47 at the time of the ALJ's 2006 decision (Tr. 52). He has a high school equivalency degree and past relevant work experience as a longshoreman and a welder (Tr. 69, 71).

5

*Medical Evidence*

On July 9, 2002, the plaintiff's physician, Dr. James Connelly, referred him to Dr. James C. McIntosh, an orthopedist, for evaluation of a right shoulder injury On July 3, 2002, the alleged onset date (Tr. 101). He underwent surgery in September 2002 (Tr. 104-05). Over the next few months, the plaintiff's incision healed appropriately, and Dr. McIntosh prescribed exercise and administered an injection to the right shoulder. By December 2002, the plaintiff had slightly limited mobility in his shoulder, but had no strength deficits, atrophy or swelling. A month later, the plaintiff still had pain, however, which Dr. McIntosh thought might be related to cervical disc disease. Dr. McIntosh recommended a referral to a spine surgeon, and in February 2003, Dr. McIntosh thought there was nothing more he could do for the plaintiff and planned to release him after a functional capacity evaluation (Tr. 94-97).

The next month, the plaintiff reported to Dr. George Khoury, a spine surgeon, complaining of neck and shoulder pain. Examination revealed some restriction in neck and right shoulder range of motion. There was no neurological abnormality. Dr. Khoury ordered an MRI. The MRI revealed some bulges, worst at C3-4. Dr. Khoury recommended epidural injections. Two months later, the plaintiff reported that he was doing much better, and on May 29, 2003, Dr. Khoury released him to return to work that did not involve lifting more than 50 pounds (Tr. 150-55).

In July 2003, the plaintiff reported to his general practitioner, Dr. Betty Antia-Obong of Ashley River Family Physicians, complaining of neck and shoulder pain. He had very limited range of motion and tenderness in his neck. His physician ordered an MRI of the cervical and thoracic spine, a nerve conduction study, and prescribed medication (Tr. 126). The MRI revealed a small disc protrusion at C3-4, but a normal MRI of the cervical spine (Tr. 142). The medication provided some relief of the plaintiff's neck pain (Tr. 123).

6

On July 17, 2003, the plaintiff returned to Dr. McIntosh complaining of worsening right shoulder pain when he tried to lift upward. His range of motion was limited, but his strength was intact. Dr. McIntosh thought the plaintiff's shoulder tear was intact. Dr. McIntosh was unsure of the etiology of the plaintiff's pain (Tr. 95-96).

The same month, the plaintiff reported to Dr. Todd Joy at Pain Associates of Charleston for treatment of neck pain, back pain, and right arm numbness. Examination revealed essentially normal reflexes, strength and sensation. He was tender in the right back area. Dr. Joy's assessment was cervicalgia with possible facet joint pain. Dr. Joy recommended an exercise program and epidural steroid injections (Tr. 231-34).

On July 22, 2003, the plaintiff was referred to Dr. Cary Fechter for evaluation and treatment of breathing problems. Examination revealed that the plaintiff's intraoral orifice was decreased and that his lungs showed decreased breath sounds, and Dr. Fechter performed a bronchoscopy (Tr. 175-77).

On August 6, 2003, the plaintiff returned to Dr. Fechter, who concluded that the plaintiff had occupational bronchitis with asthmatic bronchitis and obstructive sleep apnea. Dr. Fechter noted that the plaintiff would benefit from a CPAP machine, but at the time could not afford one. A bronchoscopy had revealed endobronchial erythema and secretions consistent with chronic bronchitis. In September 2003, Dr. Fechter opined that the plaintiff had a 26-50% of his whole person based upon his pulmonary disease and limited maximum oxygen consumption (Tr. 172-78).

In August 2003, the plaintiff reported to Dr. Gerald Shealy complaining of weakness and pain in his right hand. Examination revealed signs of carpal tunnel syndrome. Dr. Shealy ordered electrodiagnostic studies, which confirmed the diagnosis of carpal tunnel syndrome (Tr. 199-202, 236-391). The plaintiff subsequently underwent surgery to repair carpal tunnel syndrome (Tr. 198, 264). In September 2003, the plaintiff

7

was diagnosed with diabetes (Tr. 118-19). In December 2003, Dr. Shealy released the plaintiff to work (Tr. 198).

The plaintiff returned to Dr. Fechter in January 2004. Pulmonary tests revealed the plaintiff's breathing was 71% and 73% of predicted. Dr. Fechter opined that the plaintiff could not be around gases, chemicals or fumes. A polysomnogram revealed moderate obstructive sleep apnea (Tr. 168-71).

In March 2004, Dr. Joyce Lewis, a State agency physician, reviewed the plaintiff's medical records and assessed his residual functional capacity. Dr. Lewis' opinion was that the plaintiff could lift and carry 50 pounds occasionally and 25 pounds frequently; sit about six hours in an eight-hour workday; and stand or walk about six hours in an eight-hour workday. She noted that the plaintiff was limited in his ability to push, pull and reach with his right arm. She thought the plaintiff could frequently perform postural activities, except that he could never climb ladders, ropes and scaffolds. She recommended that the plaintiff avoid concentrated exposure to fumes, odors, dust, gases and poor ventilation (Tr. 296-302).

An MRI of the plaintiff's cervical spine in April 2004 revealed bulges of disc material at C3-4, C4-5, and C5-6 (Tr. 286). The plaintiff subsequently presented to Dr. Thomas Duc, a physician at Pain Associates of Charleston, for treatment and an epidural injection. Examination revealed decreased grip on the right and decreased right elbow and shoulder range of motion. Dr. Duc thought the plaintiff was a candidate for epidural injections and physical therapy (Tr. 288-92).

In July 2004, Dr. Fechter wrote that the plaintiff was disabled, and it was then undetermined when he could return to work. Dr. Fechter also completed a Work Restriction Evaluation, stating that the plaintiff could work an eight-hour shift and was able to sit seven hours, stand one hour and walk up to two hours in an eight-hour workday. He thought the plaintiff could lift up to 10 pounds and could perform simple grasping and fine manipulation.

8

He thought the plaintiff could not perform above the shoulder work and could not work in heat, in cold, in dampness, at heights, with temperature changes or with exposure to dust (Tr. 165-66).

On July 26, 2004, the plaintiff returned to Dr. Duc, at which time he reported that injections relieved his pain. He complained of neck and shoulder pain and headaches but denied radiating pain. Dr. Duc administered another injection. He wrote that the plaintiff was "out of work until further notice" (Tr. 224-26).

Also in July 2004, Dr. Duc completed a Work Restriction Evaluation, in which he indicated that the plaintiff could sit three hours, walk three hours and stand two hours in an eight-hour workday. He thought the plaintiff could perform one hour of bending, squatting, kneeling and twisting in a workday, and could lift up to 20 pounds for one hour during a workday. Dr. Duc did not think the plaintiff could climb. Despite indicating the plaintiff could sit, stand and walk eight hours in a work day, Dr. Duc opined he could not work eight hours a day. He remarked that medication severely limited the plaintiff (Tr. 232).

On September 13, 2004, Dr. Fechter reported that the plaintiff was totally and temporarily disabled and that he could not perform his past work (Tr. 163). Two days later, the plaintiff returned to Dr. Duc for another injection (Tr. 220). He received additional injections in November 2004, January 2005, and March 2005 (Tr. 214-18).

On May 6, 2005, Dr. Duc completed a questionnaire composed by the plaintiff's attorney. He appeared to agree that the plaintiff had related his subjective complaints and that he thought it was reasonable that the plaintiff limited his activities and that his medication could have caused drowsiness. He further said that the plaintiff was dealing with his pain in a medically reasonable manner and that his condition would require him to take unpredictable and unscheduled breaks. He also said that the plaintiff could not work on a regular basis and that he would miss more than four days per month. Finally, Dr.

9

Duc agreed that the plaintiff's symptoms were consistent with findings that he had disc bulges at C3-4, C4-5 and C6-7 (Tr. 281-82).

***Hearing Testimony***

The plaintiff testified at the hearing that he was born in 1959 and had earned a GED (Tr. 356). He said that he had asthma and his symptoms were worse in temperature extremes (Tr. 357). He testified that he had shoulder surgery which caused problems reaching and that he had pain in his right hand (Tr. 358). In addition, he said he had carpal tunnel syndrome, which inhibited his ability to hold things (Tr. 359). He testified that he had diabetes that caused him to black out and shake (Tr. 359). The plaintiff said that he had received injections for back and neck pain that helped for two or three days and that he took pain pills (Tr. 359). He also said that he had a CPAP machine that worked well, but that he regularly fell asleep during the day (Tr. 359). He also blamed his medications for causing drowsiness (Tr. 361-62). He said that he had acid reflux and high blood pressure, but that they were controlled by medication (Tr. 361).

The plaintiff testified that during his typical day he would eat breakfast, watch television, and go to dinner (Tr. 364-65). He said that he could do household chores for an hour to an hour and a half, but that he would need to rest afterwards (Tr. 371). He testified that his neck did not hurt when he was sitting down (Tr. 372). He said that his pain was constant in every position and that medication did not totally relieve the pain (Tr. 367-68). He also claimed that the epidural injections made him drowsy (Tr. 368). He said that he had breathing problems, but took medication to help (Tr. 370-71). The plaintiff testified that his past work was as a longshoreman and a welder (Tr. 365).

Arthur Schmitt, Ph.D., a vocational expert, also testified at the hearing (Tr. 372). Dr. Schmitt stated that the plaintiff's past work was as a longshoreman (very heavy, unskilled) and a welder (heavy, skilled) (Tr. 373). The ALJ asked Dr. Schmitt whether there

10

were jobs that could be performed by an individual with the same vocational factors as the plaintiff, including the same residual functional capacity the ALJ found the plaintiff had (Tr. 373-74). Dr. Schmitt testified that the person could perform the jobs of storage facility clerk (*DOT* 295.367-026) (light, unskilled) (485 jobs in the state economy and 227,000 jobs in the national economy), bench assembly (*DOT* 706.684-022) (light, unskilled) (1,280 jobs in the state economy and 549,000 jobs in the national economy), bone picker (*DOT* 521.687-126) (light, unskilled) (1,269 jobs in the state economy and 209,000 jobs in the national economy), and dairy product inspector (*DOT* 529.687-126) (light, unskilled) (196 jobs in the state economy and 27,000 jobs in the national economy) (Tr. 374). He testified that the bone picker and storage facility clerk jobs would allow for a sit/stand option, but the dairy product inspector job would not (Tr. 374).

Dr. Schmitt further testified that there were also jobs at the sedentary level the person could perform: surveillance system monitor (*DOT* 379.367-010) (sedentary, unskilled) (540 jobs in the state economy and 155,895 jobs in the national economy), telephone quotation clerk (*DOT* 237.367-046) (sedentary, unskilled) (490 jobs in the state economy and 44,100 jobs in the national economy), and weight inspector (*DOT* 539.485-016) (sedentary, unskilled) (270 jobs in the state economy and 7,400 jobs in the national economy) (Tr. 375). The need to avoid overhead work would not impact any of the identified jobs (Tr. 375). The inability to perform continuous fine fingering or continuous grasping with the right upper dominant extremity would eliminate the jobs of telephone quotation clerk, weight inspector, storage facility clerk, and bench assembler (Tr. 375, 377).

## **ANALYSIS**

The plaintiff was 42 years old at the time of his alleged onset date of July 3, 2002, and 46 years old at the time of his hearing on May 18, 2005 (Tr. 25). He has an 11th-grade education and obtained a GED, and he has past work experience as a longshoreman

and as a welder for a shipping company (Tr. 25). He alleges disability due to diabetes, arthritis, occupational asthma, sleep apnea, and injuries to his neck, right shoulder, and right hand (Tr. 62-63). The ALJ found that the plaintiff had the residual functional capacity ("RFC") for light work not involving concentrated exposure to extreme heat/cold; not involving concentrated exposure to environmental respiratory irritants including dusts, gases, strong odors, and fumes as well as poor ventilation; not requiring more than occasional bending, squatting, stair climbing, kneeling, and twisting; not requiring climbing ropes/ladders/scaffolding; not requiring driving; and not requiring work around dangerous moving machinery or at unprotected heights. The ALJ further found that the plaintiff could perform the jobs of storage facility clerk, bench assembler, dairy product inspector, bone picker, surveillance system monitor, telephone quotation clerk, and weight inspector/tester.

The plaintiff argues that the ALJ's opinion is not supported by substantial evidence and that the ALJ erred by (1) failing to perform a proper analysis of his RFC; (2) failing to properly consider the opinion of his treating physician; (3) relying on vocational expert testimony that was in response to a hypothetical question that did not include all of his impairments; and (4) finding that there are a significant number of jobs in the national economy that he can perform. This court agrees.

***Treating Physician***

The plaintiff first argues that the ALJ failed to properly consider the opinions of his treating physician, Dr. Duc of Pain Associates of Charleston. The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 416.927(d)(2) (2006); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). However, statements that a patient is "disabled" or "unable to work" or meets the Listing requirements or similar statements are not medical

12

opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-2p. Furthermore, even if the plaintiff can produce conflicting evidence which might have resulted in a contrary decision, the Commissioner's findings must be affirmed if substantial evidence supported the decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

The regulations provide that even if an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he still must consider the weight given to the physician's opinion by applying five factors: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 404.1527(d)(2)-(5). Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. SSR 96-2p, 1996 WL 374188, *5. As stated in Social Security Ruling 96-2p:

> A finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* 1996 WL 374188, *4.

In a United States Department of Labor form entitled "Work Restriction-Evaluation" on July 26, 2004, Dr. Duc expressed the opinion that the plaintiff was limited to sitting for 3 hours, walking for 3 hours, and standing for 2 hours during an 8

hour period. Dr. Duc also indicated that the plaintiff should be restricted to lifting, bending, squatting, kneeling, and twisting for only1 hour during an 8 hour workday, with lifting limited to a maximum of 10-20 pounds. Furthermore, in response to Question 12a in the form – "Can the individual work eight hours in a day?" -- Dr. Duc checked the box for "No." (Tr. 232).

Dr. Duc also addressed the plaintiff's functional limitations and work capabilities in a questionnaire dated May 6, 2005. In the questionnaire, Dr. Duc opined that the plaintiff would need to lie down for 45 minutes to one hour after he performed only one to one and one-half hours of physical activity; that he would need to take unscheduled breaks and rest periods; and that he would likely be absent from his job more than four days a month if he attempted to work. Significantly, Dr. Duc specifically indicated that the symptoms that the plaintiff reported and the limitations outlined in the questionnaire were consistent with the objective findings on his MRI of subligamentous disc bulges at the C5-4, C4-5, and C5-6 levels (Tr. 281-82).

The ALJ found as follows with regard to Dr. Duc's opinions:

> The undersigned finds the information received from Dr. Duc (dated May 6, 2005) which indicates that the claimant is incapable of working on a regular and continuing basis because it is not supported by the medical evidence. Specifically, Dr. Duc himself completed a questionnaire in July of 2004, in which he indicated that although the claimant was restricted from climbing, he could sit, walk and stand intermittently throughout the day, could lift ten to twenty pounds, and could perform simple grasping and pushing/pulling activities. Additionally, Dr. Khoury indicated earlier that the claimant could return to work without restriction other than not lifting more than 50 pounds.

(Tr. 24).

The plaintiff argues that the ALJ's decision is devoid of any specific finding regarding the weight given to the opinions of this treating physician. The ALJ's statement, "[T]he undersigned finds the information received from Dr. Duc (dated May 6, 2005) which

14

indicates that the claimant is incapable of working on a regular and continuing basis because it is not supported by the medical evidence" is unintelligible, unless one guesses at the words that were left out between "basis" and "because." It can be inferred that the ALJ gave less than controlling weight to Dr. Duc's opinions based on her statement that "it is not supported by the medical evidence." However, as argued by the plaintiff, such statement is not enough to satisfy the requirements of SSR 96-2 for a clear and specific explanation of the precise weight given to a treating source's medical opinions.

The plaintiff notes that while the ALJ stated that Dr. Duc's assessment of the plaintiff's limitations in the May 6, 2005, questionnaire was "not supported by the medical evidence," her decision cites no diagnostic test or other objective medical evidence inconsistent with the opinions expressed by this treating physician. It appears that her primary basis for declining to give controlling weight to Dr. Duc's assessment is that "Dr. Duc himself completed a questionnaire in July of 2004, in which he indicated that although the claimant was restricted from climbing, he could sit, walk and stand intermittently throughout the day, could lift 10 to 20 pounds, and could perform simple grasping and pushing/pulling activities" (Tr. 24). The plaintiff argues that, rather than providing the basis for discounting or rejecting Dr. Duc's opinions in the May 2005 questionnaire, the July 2004 U.S. Department of Labor form is highly consistent with the questionnaire. Indeed, Dr. Duc consistently opined in both opinions that the plaintiff has significant limitations in his ability to walk, stand, and sit for extended periods of times, and both documents reflect that he lacks the capacity to perform the walking and standing requirements of work at the light exertional level.[2] Further, Dr. Duc's response of "No" to the question regarding the plaintiff's ability to work an eight-hour day in July 2004 is consistent with his latter response of "No" in May 2005 to the question, "Do you feel that Mr. Robinson is capable of working on a

---

[2]As noted by the ALJ, light work involves an ability to stand and walk for six hours in an eight-hour workday (Tr. 22).

15

regular and continuing basis i.e. 8 hours a day, for 5 days a week, or an equivalent work schedule?" This court agrees that the July 2004 assessment by Dr. Duc does not provide substantial evidence to discount Dr. Duc's subsequent opinion as to the nature and extent of the plaintiff's functional limitations.

Further, the plaintiff also notes that the ALJ cited Dr. Khoury's report of May 29, 2003, which indicated that the plaintiff had only a 50-pound lifting restriction, as a further basis for declining to give controlling weight to Dr. Duc's assessment (Tr. 24, 150). However, as Dr. Khoury's reports reflect, this evaluation was primarily due to the findings from the plaintiff's MRI on March 19, 2003, that showed "minimal disc desiccatory changes" and "no indication of central canal stenosis or overt neural foraminal stenosis at any level" (Tr. 155). The plaintiff subsequently underwent another MRI on April 1, 2004, which was positive for midcervical central subligamentous bulge of disc material at C3-C4, C4-C5, and C5-C6. Dr. Duc specifically found that the MRI findings were consistent with the plaintiff's symptoms and functional limitations (Tr. 281-282). Therefore, the plaintiff argues that Dr. Duc's evaluation of plaintiff's functional capabilities is entitled to more weight than Dr. Khoury's earlier assessment, based upon the additional medical evidence relating to his cervical spine abnormalities that subsequently became available.

This court agrees with the plaintiff that the ALJ failed to properly evaluate Dr. Duc's opinions. Based upon the foregoing, upon remand, the ALJ should be instructed to re-evaluate the opinions of Dr. Duc in accordance with the above-cited law.

***Residual Functional Capacity***

The plaintiff next argues that the ALJ failed to perform a proper analysis of his RFC. This court agrees.

> The Residual Functional Capacity ("RFC") assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g.,

16

> laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work- related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.
> . . .

SSR 96-8p, 1996 WL 374184, *7. Significantly, SSR 96-8p specifically states that "the RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.*

In a disability case, the combined effect of all the claimant's impairments must be considered without regard to whether any such impairment if considered separately would be sufficiently disabling. Where there is a combination of impairments, the issue "is not only the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's 'ability to engage in substantial gainful activity.'" *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir. 1974). The ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. *Id.* The cumulative or synergistic effect of the various impairments on the claimant's ability to work must be analyzed. *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

> The ALJ found as follows with regard to the plaintiff's RFC:
>
> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity for work at the light (as described by the Commissioner of Social Security Administration as involving lifting and carrying 20 pounds occasionally and 10 pounds frequently as well as an ability to stand for 6 hours in an 8-hour workday, walk for 6 hours in an 8-hour workday, and sit for the remaining 2 hours in an 8-hour workday) not involving concentrated exposure to

> extreme heat/cold; not involving concentrated exposure to environmental respiratory irritants including dusts, gases, strong odors, and fumes as well as poor ventilation; not requiring more than occasional bending, squatting, stair climbing, kneeling, and twisting; not requiring climbing ropes/ladders/scaffolding; not requiring driving; and not requiring work around dangerous moving machinery or at unprotected heights.

(Tr. 22-23).

The ALJ's assessment of the plaintiff's limitations significantly conflicts with Dr. Duc's 2004 assessment of the plaintiff's limitations, particularly with regard to walking, standing, and lifting. However, the ALJ failed to explain why she did not adopt Dr. Duc's opinion as to the plaintiff's limitations. The defendant concedes error, noting that a light job requires standing and walking for six hours during an eight-hour workday, and a sedentary job requires sitting for six hours during an eight-hour workday (def. brief 14-15). However, the defendant argues that the error is harmless because the ALJ included a sit or stand option in the hypothetical question to the vocational expert (def. brief 15; Tr. 374). As will be discussed below, this error is not harmless.

Upon remand, the ALJ should be instructed to assess the plaintiff's RFC in accordance with the foregoing.

***Vocational Expert Testimony***

The plaintiff next argues that the ALJ failed to included all of his limitations and restrictions, especially those outlined by Dr. Duc in his 2004 and 2005 opinions, in the hypothetical question to the vocational expert. This court agrees. "[I]n order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (citation omitted). As discussed above, the ALJ should be instructed upon

18

remand to re-evaluate Dr. Duc's opinions and to properly assess the plaintiff's RFC. The ALJ should then be instructed to obtain supplemental vocational expert testimony and to include all of the plaintiff's limitations and restrictions in the hypothetical question to the vocational expert.

*Jobs in National Economy*

The ALJ found that plaintiff was incapable of performing any of his past relevant work; thus, the burden of proof in this case shifted to the Commissioner at step five of the sequential evaluation process. The ALJ found that plaintiff was capable of performing six jobs based upon the vocational expert's testimony. (Tr. 26). However, when the ALJ added additional limitations established by the record for the hypothetical individual, including the sit/stand option and the inability to perform continuous, fine fingering or continuous grasping with the dominant upper extremity the vocational expert eliminated most of these jobs (Tr. 374-75).

As discussed above, the defendant argues that any error by the ALJ in failing to include the limitations found by Dr. Duc in the plaintiff's ability to sit, stand, and walk was harmless as the ALJ included a sit or stand option in his hypothetical to the vocational expert. In response, the vocational expert testified that two of the jobs could be performed with a sit or stand option: storage facility clerk and bone picker (Tr. 374). However, later in the hearing, the vocational expert eliminated the job of bone picker when it was pointed out during cross-examination that this occupation was inconsistent with the limitation to no exposure to strong odors in the hypothetical question (Tr. 378). Further, the ALJ herself found that the plaintiff's respiratory restrictions resulted in a 60% reduction in the number of jobs identified by the vocational expert for the position of storage facility clerk (Tr. 26).

Accordingly, upon remand, should the sequential evaluation process proceed to step five, the ALJ should be instructed to properly evaluate whether other work exists in

19

significant numbers in the national economy that the plaintiff can do, given his RFC, age, education, and work experience.

## **CONCLUSION AND RECOMMENDATION**

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. §405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

s/William M. Catoe<br>
United States Magistrate Judge

January 29, 2010

Greenville, South Carolina